IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

PATRICIA JOHNSON,              )
                              )
            Plaintiff,         )
                              )
    v.                        ) Case No.
                              ) 06-0517-CV-W-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,            )
                              )
            Defendant.         )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Patricia Johnson seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Title II of
the Social Security Act ("the Act"). Plaintiff argues that (1)
plaintiff's full record was not considered in the final decision,
(2) the vocational expert's testimony was not based on a properly
phrased hypothetical question, (3) the ALJ failed to indicate the
weight given to the treating physician's opinion, and (4) the ALJ
failed to conduct a proper credibility analysis. I find that the
substantial evidence in the record as a whole supports the ALJ's
finding that plaintiff is not disabled. Therefore, plaintiff's
motion for summary judgment will be denied and the decision of
the Commissioner will be affirmed.

## I.   BACKGROUND

On March 7, 2003, plaintiff applied for disability benefits
alleging that she had been disabled since January 22, 2003.

Plaintiff's disability stems from left and right rotator cuff injuries. Plaintiff's application was denied on July 10, 2003. On April 26, 2005, a hearing was held before an Administrative Law Judge. On May 16, 2005, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On April 26, 2006, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into

Case 4:06-cv-00517-REL   Document 19   Filed 04/26/07   Page 2 of 38

consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other

3

type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

Yes = not disabled.
No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

No = not disabled.
Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes = go to next step where burden shifts to Commissioner.

4

5.     Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.  *THE RECORD*

The record consists of the testimony of plaintiff; medical expert Dr. Lynn Curtis, and vocational expert Janice Hastert, in addition to documentary evidence admitted at the hearing.

### A.    *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1973 through 2003:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1973 | $     137.25 | 1989 | $30,163.72 |
| 1974 | 0.00 | 1990 | 29,552.54 |
| 1975 | 0.00 | 1991 | 6,297.31 |
| 1976 | 0.00 | 1992 | 14,250.87 |
| 1977 | 0.00 | 1993 | 23,051.95 |
| 1978 | 5,665.67 | 1994 | 30,173.90 |
| 1979 | 14,264.76 | 1995 | 43,884.40 |
| 1980 | 14,374.69 | 1996 | 46,402.39 |
| 1981 | 18,731.82 | 1997 | 46,140.44 |
| 1982 | 21,398.05 | 1998 | 42,186.57 |
| 1983 | 23,814.60 | 1999 | 42,470.89 |
| 1984 | 22,509.09 | 2000 | 42,072.49 |

5

| 1985 | 24,320.72 | 2001 | 41,581.78 |
|------|-----------|------|-----------|
| 1986 | 25,134.44 | 2002 | 42,539.27 |
| 1987 | 28,782.47 | 2003 | 29,957.58 |
| 1988 | 27,552.57 | | |

(Tr. at 75).

**COLLEGE CREDIT**

In a form completed on August 30, 2004, plaintiff reported that she graduated from high school and had completed 63 college credit hours in marketing (Tr. at 237).

**B.    *SUMMARY OF MEDICAL RECORDS***

On May 10, 2001, plaintiff underwent a right anterior acromioplasty[1] and rotator cuff repair performed by M. Scott Beall, Jr. (Tr. at 251).

On August 1, 2001, Dr. Beall released plaintiff to light work duties with no use of her right upper extremity (Tr. at 287).

---

[1]Shoulder impingement syndrome is caused by compression of the tendons of the rotator cuff between a part of the shoulder blade and the head of the humerus (main bone in the upper arm). This can become a chronic inflammatory condition that may lead to a weakening of the tendons of the rotator cuff, a situation that may result in a torn rotator cuff. When shoulder surgery is necessary, the surgical procedures used by doctors are designed to make more room for the tendons of the rotator cuff. This is accomplished by removing bone spurs that the tendon rubs on in order to make more room for the tendon to glide normally. This type of surgery is called an "acromioplasty".

6

On September 18, 2001, plaintiff was released to light work duties with no lifting over ten pounds, no climbing, and no use of her right arm shoulder level or above (Tr. at 261, 291-292).

On October 22, 2001, plaintiff saw Dr. Beall for a follow up (Tr. at 266, 300). Dr. Beall noted that plaintiff was doing satisfactorily with her right arm, but now was beginning to have trouble with her left shoulder. He recommended physical therapy for a few weeks.

On November 8, 2001, plaintiff saw Dr. Beall for a follow up (Tr. at 301). Plaintiff had begun having problems with her left shoulder. Dr. Beall ordered an MRI of the left shoulder and restricted plaintiff to light duty, no lifting over ten pounds, no use of her arms shoulder level or above.

On January 9, 2002, plaintiff saw Larry Frevert, M.D., an orthopedic surgeon, for an evaluation of her left shoulder (Tr. at 227-228, 305-306). "She originally injured the right shoulder, had surgery on it back in May by Dr. Beall and has continued under his care for that. She has actually done fairly well with that shoulder." It was noted that plaintiff was smoking a half pack of cigarettes per day, did not drink, and was 5'4" tall and weighed 165 pounds. Dr. Frevert recommended an open rotator cuff repair.

On January 28, 2002, plaintiff saw Dr. Beall for a follow up (Tr. at 307, 336). She was having some trouble with her right shoulder with repeated activities over a period of time, but had "fairly good relief of overall pain."

On March 7, 2002, plaintiff underwent an open left rotator cuff repair, performed by Dr. Frevert (Tr. at 148-149, 226, 308-315).

On May 8, 2002, plaintiff saw Dr. Frevert for a follow up on her shoulder (Tr. at 316, 342). "In general we are making progress. Her range of motion certainly is not full, but she can be abducted up to close to 90 degrees and external rotated to about 45 degrees." Dr. Frevert started plaintiff on active range of motion exercises and strengthening exercises. He told her not to use her left arm at work.

On June 5, 2002, Dr. Frevert wrote a prescription for no lifting greater than four pounds with her left arm and no activities above the waist level for four weeks (Tr. at 318).

On July 17, 2002, plaintiff saw Dr. Frevert for a follow up (Tr. at 217, 321, 349). "In general overall her pain is actually pretty good at this point in time. She is not having a whole lot of pain with the arm, except when she is stretching and moving it in therapy." Dr. Frevert restricted her to no overhead activity and no lifting over five pounds.

On August 15, 2002, plaintiff saw Dr. Frevert for a follow up (Tr. at 214, 323, 325, 346, 350). "In general I think she continues to show good improvement. She still lacks some abduction and some external rotation, but I think it is notably better than the last time I saw her. She is still having quite a bit of achiness in the shoulder; not the sharp pain that she was having before, but a lot of achiness and it goes down the arm as well. I think that is inflammatory." Dr. Frevert recommended work hardening for half days, prescribed Vioxx, and continued her on light duty, half days, at work.

On August 30, 2002, plaintiff saw Dr. Washington Muro for a check up (Tr. at 184). He assessed hyperthyroidism and depression. He recommended regular aerobic exercise.

On September 19, 2002, plaintiff was seen at Health Midwest Outpatient Rehabilitation Program for work hardening (Tr. at 327-331, 355-359). She was working light duty at the time. Plaintiff was able to complete two minutes ten seconds of a five-minute sustained unweighted overhead reach test before stopping to due discomfort and left shoulder fatigue. Plaintiff was able to walk one-third mile in four minutes 58 seconds with a good pace, good upright posture and good bilateral arm swing. There was no postural guarding or functional concerns noted. Plaintiff was able to complete five flights of 14 stairs in one minute 15

9

seconds without using handrails.  She reported no changes in discomfort.  "The client demonstrates the ability to complete a repetitive unweighted overhead reach test demonstrating full right upper extremity reach.  She demonstrates a decrease in left upper extremity reach by approximately 25% of the right.  She demonstrates increased difficulty in maintaining left upper extremity function, however, is able to complete the activity despite visible fatigue.  There is good effort noted for this activity."

On September 20, 2002, plaintiff saw Dr. Frevert for a follow up (Tr. at 332-333, 360-361).  He noted that plaintiff's motion was better and her strength was starting to get better.  "She is having a little bit less pain and problems with it and overall I am pleased."  He recommended that plaintiff continue with work hardening therapy three times a week for the next four weeks and that she continue on light duty status at work.

On October 16, 2002, Janet Morgan, plaintiff's occupational therapist, prepared a report stating that plaintiff had attended 32 out of 33 half-day work hardening sessions since August 21, 2002 (Tr. at 132-133).  Plaintiff had missed one session due to illness.  Her motivation in therapy was rated as "very good."  Ms. Morgan noted that plaintiff had increased subjective complaints of left shoulder discomfort with lifting and reaching

10

activities; continued decreased left shoulder flexibility with slightly decreased strength to manual muscle testing; and decreased materials handling capabilities compared to job requirements for her position as a packer, rated as medium to medium-heavy with lift and carry maximums at waist level of 75 pounds and overhead at 35 pounds. Ms. Morgan recommended that plaintiff "be considered for release to return to work full time within FCE and physician guidelines as indicated appropriate. May consider restriction of combined overhead and forward reaching activities not to exceed occasional, i.e., up to 1/3 of total work shift, with maximum lifting within the lift work category, i.e., 10 to 20 # on an occasional basis." Plaintiff was to continue all home program exercises that she was currently performing.

On October 17, 2002, plaintiff saw Dr. Frevert for a follow up on her shoulder (Tr. at 208). Dr. Frevert noted that plaintiff had been working light duty and he remarked that "I think that is good for the shoulder". Plaintiff still had some notable limitations with overhead activity. He gave her an injection of Lidocaine and DepoMedrol. He allowed her to return to work the next day with the same restrictions and told her to continue her home therapy program.

On November 14, 2002, plaintiff was seen by Dr. Frevert for a follow up on her left shoulder (Tr. at 207). "The injection we gave her did seem to loosen up the joint some. It has decreased her pain some, which I am very happy with. She is still weak with overhead activity and I had a discussion with her about that. I think number one, she needs to continue with a home program, which she is doing and doing a routine, which I think will do nothing but help her." Dr. Frevert limited plaintiff to no overhead activity and no repetitive lifting. She could do some occasional lifting to waist height. "She is encouraged to continue with her home program."

On November 21, 2002, Dr. Frevert wrote a prescription stating that plaintiff should do no overhead activity and no repetitive lifting, but that it was OK for her to do occasional lifting up to waist height and to lift no more than ten to 15 pounds (Tr. at 206, 368, 372). Repetitive movement was to be no more than ten times per hour.

January 22, 2003, is plaintiff's alleged onset date.

On January 28, 2003, Larry Frevert, M.D., wrote a letter to Liberty Mutual (Tr. at 204-205, 375-376, 377-378). The letter reads in part as follows:

> She was last seen on 11/14/02. At that time she still had some weakness with overhead activity. It was felt that she needed to continue with a home program and strengthening. Due to limitations in pain at that time it was felt best to

12

limit her to no overhead activity and no repetitive lifting. It was felt that she could lift to waist height, but much more than that was doing [sic] to be a problem. At that point it was felt that there were no other plans for formal intervention, except for her to continue with a home program. With that, she was released from care.

In considering her rating, she has lost a fair amount of overhead activity and continues to have some significant pain, at least at times. Taking that into consideration, it is felt that she has a fifteen percent (15%) impairment rating at the level of the shoulder.

On January 30, 2003, plaintiff saw Dr. Washington Muro for a six week follow up (Tr. at 182). He assessed bilateral shoulder pain status post surgery and referred her to ortho.

On February 5, 2003, plaintiff had x-rays of her shoulders (Tr. at 189). The impression was listed as follows: "There has been an osteotomy[2] of the distal 2 cm of the left clavicle (collar bone), with the left shoulder otherwise normal. There is mild degenerative change in the right acromioclavicular joint, with the shoulder otherwise benign."

On April 2, 2003, plaintiff saw Dr. Beall; however, there is only one page of a seven-page record and I have been unable to find the rest of this record (p. 158). His impression was "healed right rotator cuff tear."

On April 10, 2003, plaintiff saw Dr. Washington Muro for bilateral shoulder problems (Tr. at 181). Plaintiff said she was having trouble doing her job due to her pain. Dr. Muro assessed

---

[2]Removal of part of the bone.

13

bilateral shoulder pain status post surgery.  He recommended that she follow up with ortho and in the meantime, no lifting over ten pounds, no overhead lifting, and no repetitive lifting.

On April 22, 2003, plaintiff had an MRI of her right and left shoulder and x-rays of both shoulders (Tr. at 188-189).  The impression based on the right shoulder MRI was "postoperative changes involving the distal supraspinatus tendon with associated intermediate signal.  No definite gross tear can be seen.  If clinical suspicion of a tear remains high, then would recommended an MR shoulder arthrogram[3]."  The impression based on the left shoulder MRI was "postoperative changes.  There is a small focus of increased signal on T2 along the undersurface of the supraspinatus tendon for which a partial tear should be considered."  The impression for the bilateral shoulder x-rays was "There has been an osteotomy of the distal 2 cm of the left clavicle, with the left shoulder otherwise normal.  There is mild degenerative change in the right acromioclavicular joint, with the shoulder otherwise benign."

On June 5, 2003, plaintiff was seen by Michael Hall, M.D., a hand and upper extremity specialist (Tr. at 190).  The record reads as follows:

_____

[3]A test using x-ray and contrast material to take pictures of a joint.

Patricia returns today, but she was actually . . .
suppose[d] to return 04/02 and she did not.  She went back
to Dr. Muro and obtained an MRI on 04/22.  She never went to
therapy like I told her and then she told her Workman's Comp
doctor said therapy would not help her.  This was the 1st
excuse she gave me and then the 2nd excuse was that the
therapist also told her it was not going to help her.
First, this is not Work Comp anymore.  It was Work Comp when
she initially was operated on by Dr. Freiberg [Frevert], who
has released her.  So she should not be listening to the
Work Comp doctor.  Secondly, I have never had a therapist
say that therapy would not help and they at least try when I
order it.  When I later asked her, she then admitted she
wasn't willing to pay the co-pay.  She says she is now out
of a job and her insurance is running out in August.  She
asked if I looked at the MRI that was sent and I did.  The
MRI shows changes essentially consistent with a previous
surgery.  The patient has failed to listen to me for any of
my recommendations.  Until she does follow those
recommendations, I can no longer offer her any type of help.
She says her lawyer is going to try to get this medical
stuff paid for by Work Comp.  Unfortunately, that is nothing
I can control.  I will be more than happy to take care of
her once she is willing to follow my previous instructions.
Surgical intervention will not be performed until an
adequate trail of conservative care has been tired [sic].  I
did not do anything medically for her today other than
talking to her about this problem.  I did not charge her a
co-pay.

On January 15, 2004, plaintiff saw Ronald Stitt, M.D. (Tr.

at 387).  Plaintiff was taking only Advil.  Plaintiff reported

she was able to carry out her activities of daily living.

Physical exam showed active range of motion on the right shoulder

to 90 degrees of flexion, 90 degrees abduction.  Neurovascular

function in both upper extremities was normal.  She had full

range of motion without pain in her cervical spine.  Dr. Stitt

had x-rays taken and reviewed her MRIs from April 2003.  He

15

assessed impingement syndrome, right and left shoulders. Plaintiff was doing exercises with pulleys and was scheduled to begin strengthening exercises. Dr. Stitt told her to follow up in six weeks.

On February 26, 2004, plaintiff saw Ronald Stitt, M.D., for a follow up on her shoulders (Tr. at 384). Plaintiff had been through physical therapy and was doing her exercises at home. She complained of continued pain. Physical exam showed abduction to approximately 90 degrees bilaterally, forward elevation 90 degrees bilaterally, normal neurovascular function, normal sensation and motor function. There was no tenderness to palpation over the acromioclavicular joint of either shoulder. Dr. Stitt assessed impingement syndrome of both shoulders. He injected both shoulders with Kenalog and Marcaine.

On April 5, 2004, plaintiff saw Michael Hall, M.D., a hand and upper extremity specialist (Tr. at 386). Plaintiff reported that Dr. Stitt injected both her shoulders but it did not help. "She is presently under a litigation for her shoulders to see whether or not future medical care would be provided by her Workmen's Comp. She is complaining [of] a pain exactly how she was before and . . . I know that nothing has seemed to help her so far including physical therapy. She says her shoulders both hurt. [The pain] radiate[s] into her brachium [arm]." On exam,

16

plaintiff had about 135° forward flexion in the right side with 45° external rotation. She had positive impingement and positive active and passive Jobe. "I reviewed her x-rays, which show no high-riding humerus". Dr. Hall stated that Dr. Stitt has treated plaintiff appropriately, there was nothing he could do for her, and he recommended she see her original physician.

On August 30, 2004, plaintiff completed an Oswestry Function Test[4] (Tr. at 238-241). She noted that pain killers give her moderate relief from pain, she is able to manage most of her personal care but needs some help, she can only lift very light objects, pain does not prevent her from walking any distance, she can sit in any chair as long as she likes, she can stand as long as she wants without extra pain, and that even with medicine she sleeps less than six hours per night but more than four. She noted that her pain is bad when traveling but she can manage journeys of over two hours.

---

[4]The Oswestry Disability Index, also known as the Oswestry Low Back Pain Disability Questionnaire, is a tool that researchers and disability evaluators use to measure a patient's permanent functional disability. The test has been around for 25 years and is considered the "gold standard" of low back functional outcome tools. The patient is directed to answer the questions by choosing the best answer that describes his or her typical pain and/or limitations within the last week or two. If the limitations fall between two questions, the patient is instructed to pick the higher point value question. After the patient has finished the test, the points are added and the sum is divided by 50 and then multiplied by 100 to get the percent of disability.

On December 23, 2004, plaintiff saw Dr. Muro for a follow up on her shoulder pain (Tr. at 381, 385). Her pain was greater on the left than the right and she had continued weakness and difficulty using her shoulders "for work or any activities at home. She cannot use her shoulders physically at this time." Dr. Muro's physical exam did not list any findings or examination of plaintiff's arms or shoulders. He assessed persistent/ progressive shoulder pain and "multiple new problems" without indicating what those problems are. His plan was for plaintiff to continue on her current medications (Bextra, a non-steroidal anti-inflammatory; Amitriptyline, an antidepressant used to aid in sleep) "for chronic pain and permanent disability from her work", he recommended she go back to an orthopedic surgeon, and that she continue her psychotherapy.

On February 28, 2005, plaintiff saw Dr. Muro complaining of shoulder pain, left worse than the right (Tr. at 383). She reported difficulty raising her arms above shoulder level and "she can not work at her original occupation. She feels well otherwise." Plaintiff was taking Bextra and Amitriptyline. Dr. Muro assessed chronic shoulder pain and "Multiple med problems". He continued plaintiff on Bextra and referred her to an orthopedic doctor. "Pt. still disabled from her occupation."

18

On March 7, 2005, plaintiff was seen by Harold West, M.D., at Orthopedic Associates of Kansas City for an evaluation of her upper extremities (Tr. at 382).  Plaintiff was taking Skelaxin (a muscle relaxer), Amitriptyline, and Estrace (estrogen).  "She has had some 'psychological problems'.  She bruises easily.  She currently smokes."  Plaintiff had 2/3 of the normal range of motion of her right shoulder.  She could forward elevate to about 100-110 degrees, she was able to abduct to 90 degrees, internal and external rotation were essentially full.  With her left shoulder she could elevate 30 degrees, abduct 30-35 degrees, and internal and external rotation were full.  Dr. West had x-rays taken.  The right shoulder was essentially normal.  "The left shoulder shows a surgical loss of the distal end of the clavicle.  The humerus is high riding.  I suspect that she has re-torn the rotator cuff on the left."  Dr. West ordered MRIs of both shoulders.

On March 16, 2005, plaintiff returned to see Dr. West (Tr. at 382).  According to Dr. Corey who reviewed the MRIs, plaintiff had a tear in the right shoulder but there were no changes in the left shoulder.  He gave her an injection in her left shoulder and put plaintiff on a Medrol Dosepak.

19

*C.*  *SUMMARY OF TESTIMONY*

During the April 26, 2005, hearing, plaintiff testified.  In addition, Dr. Lynn Curtis, a board-certified physical medicine and rehabilitation specialist, testified as a medical expert, and Janice Hastert, vocational expert, testified, both at the request of the ALJ.

**1.  Plaintiff's testimony.**

At the time of the hearing, plaintiff was 49 years of age and is currently 51 (Tr. at 391).  She was 5' 4" tall and weighed 155 pounds (Tr. at 392).  Plaintiff is married and has two grown children (Tr. at 392).  She and her husband live in a split level house (Tr. at 392).  Plaintiff's husband is retired (Tr. at 405).  Plaintiff's husband drove her to the hearing, although she has a valid driver's license and she does drive occasionally (Tr. at 393).

Plaintiff has a high school education along with 56 credit hours of college (Tr. at 393).  Plaintiff last worked on April 25, 2003, when she was terminated due to her injuries (Tr. at 393).  She worked in manufacturing at Aventis Pharmaceuticals (Tr. at 393-394).  Plaintiff was a packaging operator (Tr. at 394).  She filled hoppers, ran the filler machine, and tore down machinery when it needed to be cleaned (Tr. at 394).  Plaintiff was injured at work and had a pending worker's compensation claim

20

(Tr. at 394).

Plaintiff has had bilateral rotator cuff surgeries (Tr. at 395). Other than her shoulders, she was having stiffness in her neck (Tr. at 395). Plaintiff was able to raise her right arm about perpendicular to her body, but could not raise her left arm that high (Tr. at 396). Plaintiff is right-handed (Tr. at 396). Plaintiff has trouble gripping due to pain (Tr. at 396). Plaintiff is able to write with a pen and paper (Tr. at 397).

Plaintiff sometimes has trouble with vests, bras, and zip-up clothing, so her husband helps her with those items (Tr. at 397). She has trouble mopping and vacuuming because of her shoulders (Tr. at 398). Plaintiff went through physical therapy, but it did not help and they told her there was nothing else they could do for her (Tr. at 398). Plaintiff does not have problems sitting, standing, or walking, but her arm hurts when she sits and she needs to let it hang to get comfortable (Tr. at 398-399).

Plaintiff's pain keeps her from sleeping at night (Tr. at 402). She wakes up three or four times to adjust her arms so she can sleep (Tr. at 403). Sometimes she uses heating pads and sometimes she takes a hot shower to ease the pain (Tr. at 403). Plaintiff sometimes has trouble focusing because of the pain, and her pain is worse in the air conditioning (Tr. at 403). Cold weather and rain also aggravate her pain (Tr. at 403-404). At

21

the time of the hearing, plaintiff was taking Bextra, Skelaxin, and Ibuprofen for pain (Tr. at 399). She had taken Prednisone and has had cortisone shots.

Plaintiff testified that she was depressed because she was taking Amitriptyline (an antidepressant), but then she said she was taking that medication to help her sleep (Tr. at 404).

Plaintiff is able to go to restaurants, theaters, and church, and she gets together with her friends and family (Tr. at 400). She described herself as fairly active (Tr. at 400).

Plaintiff applied for long-term disability through Aventis (Tr. at 401). She received those payments for almost two years, but then it was stopped because her doctor could not give them enough information to keep her disability going (Tr. at 401).

Plaintiff previously worked as a receptionist, but she does not think she could do that job today because talking on the phone causes pain and plaintiff has to switch the phone from hand to hand (Tr. at 405-406). Plaintiff has never used a telephone headset (Tr. at 406). When asked if she could do that job with a telephone headset, plaintiff said, "I don't understand how could I even focus really trying to do anything with this pain that I have." (Tr. at 407).

22

**2.  Medical expert's testimony.**

Medical expert Dr. Lynn Curtis testified at the request of the Administrative Law Judge.  After reviewing plaintiff's medical records, Dr. Curtis diagnosed bilateral rotator cuff tear with repair, with resultant loss of range of motion and chronic shoulder pain (Tr. at 413).

Dr. Curtis found no medical basis for plaintiff's claim of diminished grip (Tr. at 414).  The trouble sleeping at night is documented in the record and there is a medical basis for that complaint (Tr. at 414).

Based on the medical records and records of prescribed medications, Dr. Curtis described plaintiff's pain as moderate prior to her surgery, and mild to moderate after surgery, moderate while sleeping (Tr. at 415).  Dr. Curtis found no medical basis for plaintiff's claim of loss of focus or concentration due to pain (Tr. at 415, 421-422).  Dr. Curtis believes from his review of the medical records that plaintiff could hold an eight-ounce glass of water in her hand for five minutes (Tr. at 419-420).

Dr. Curtis found that plaintiff had no limitations in sitting, standing, walking on level surfaces, climbing stairs, or gripping (Tr. at 415, 416).  He found that she could lift a maximum of 20 pounds from waist to chest, and a maximum of ten

23

pounds from chest to shoulder (Tr. at 415-416). She could only seldom bend at the waist to pick up objects off the floor (Tr. at 416). Plaintiff should avoid overhead activities, climbing ladders, and balancing (Tr. at 416-417).

**3. Vocational expert testimony.**

Vocational expert Janice Hastert testified at the request of the Administrative Law Judge. The first hypothetical involved a person with a high school education and two years of college; with bilateral rotator cuff tears with surgical repair on both; pain in her shoulders; unlimited grip with her right hand in front of her on a table, desk or bench; limitation with the non-dominant left upper extremity with gripping and grasping; can use her dominant right hand for writing and small gripping activities; should not do any overhead activity; should do no crawling, balancing, or climbing of ladders; could lift 20 pounds from waist to chest level and carry it 15 feet ten to twelve times per hour; could carry a maximum of ten pounds from chest level and above; should never carry objects above mouth level; should never work with her hands above her head; has no limitation on sitting, standing, walking, or climbing stairs; and should seldom bend over (Tr. at 424-425). In this hypothetical, the person did not have difficulty focusing or concentrating (Tr. at 425). The vocational expert testified that such a person

24

could perform plaintiff's past relevant work as a receptionist (Tr. at 425).

The second hypothetical included pain so great bilaterally in both shoulders extending down both arms that the person could not focus, pay attention, concentrate, or stay on task for at least one third of the day (Tr. at 425-426). The vocational expert testified that such a person could not work (Tr. at 426).

## V. *FINDINGS OF THE ALJ*

Administrative Law Judge Gary Lowe entered his opinion on May 16, 2005.

Step one: Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 16).

Step two: Plaintiff has the following severe impairment: bilateral rotator cuff tears with repair of both with resulting reduced range of motion and mild to moderate chronic pain (Tr. at 17).

Step three: Plaintiff's severe impairment does not meet or equal a listed impairment (Tr. at 17).

Step four: Plaintiff retains the residual functional capacity to grip and grasp with her dominant right hand in an unlimited fashion in front of her on a desk, table, or bench, but would have definite limitation in the non-dominant left hand, as the pain is worse, with more diminished gripping sensation, but

25

could use her right hand for writing, notation and small gripping activities.  She should avoid overhead activity, crawling, balancing, or climbing ladders. She can lift 20 pounds from waist to chest level and carry it 15 feet, ten to 12 times an hour, but can only lift a maximum of ten pounds from chest and above, but should never take any weight over the face level with her hands above her head.  She has no limitations in sitting, standing, walking, or climbing stairs.  She should seldom bend over (Tr. at 18).  With this residual functional capacity, plaintiff is capable of returning to her past relevant work as a receptionist and data entry clerk (Tr. at 19).

Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI.  CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.  CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999);

Case 4:06-cv-00517-REL   Document 19   Filed 04/26/07   Page 26 of 38

McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

27

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

Claimant's earnings record reveals that she has a good work history. This evidence suggests that claimant has some motivation to work. However, the medical evidence and the overall record do not support claimant's allegation that she cannot work.

. . . While the record supports claimant's allegation of bilateral rotator cuff tears, the record indicates that claimant has had surgery on both shoulders. Moreover, claimant was released to light duty work with no use of her right arm shoulder level or above in September 2001, after her first surgery. Dr. Beall indicated in October 2001 that claimant was "doing satisfactory with her right arm." While the record indicates that claimant had more difficulty with residual symptoms after her left shoulder surgery in March 2002, no doctor opined that she was unable to perform all work for more than 12 months in duration. While claimant testified that she had difficulty concentrating and focusing due to her pain, the medical expert testified that there was no medical basis for these symptoms from the record. Further, claimant was able to perform light duty work since her shoulder surgeries. Overall, claimant's shoulder impairments do not appear to prevent her from performing all work, but would prevent her from doing overhead lifting and repetitive lifting. In addition, the medical expert opined that claimant could perform some light work. These factors suggest that claimant's symptoms are not as debilitating as alleged.

Claimant reported that she takes the following prescription medications: Bextra, Amitriptyline, Ibuprofen. She also takes over-the-counter medications of Ibuprofen and Extra Strength Tylenol. Claimant's continued use of these medications suggests that they are somewhat effective in alleviating her pain and helping her sleep. Claimant did not allege having any significant side effects from her medication.

Regarding her daily activities, claimant testified that she dresses herself, but her husband helps with closures in the back. She stated that she can do light housework and drive, but mopping and vacuuming are difficult. She goes to

28

restaurants, movies, and church and occasionally gets together with friends. Claimant indicated that she was receiving long term disability until March 2005. These activities are inconsistent with an individual alleging disability. Overall, the medical evidence does not support her allegations of disability.

Based on the above analysis, the undersigned finds that the testimony by claimant is not fully credible because the subjective complaints of limitation and pain are inconsistent and unsupported by the medical evidence and overall record.

(Tr. at 17-18).

1. **PRIOR WORK RECORD**

As the ALJ pointed out, plaintiff has a good prior work record, and this factor supports her credibility.

2. **DAILY ACTIVITIES**

In January 2004, plaintiff told Dr. Stitt that she is able to carry out her activities of daily living. In August 2004, plaintiff reported that she is able to manage most of her personal care, that pain does not prevent her from walking any distance, she can sit in any chair as long as she likes, and she can stand as long as she wants without extra pain. Plaintiff testified that she is able to go to restaurants, go to theaters, go to church services, get together with friends and family, and she described herself as "fairly active." Plaintiff's daily activities are inconsistent with her allegations of total disability.

29

**3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS***

In January 2002 after her right shoulder surgery, Dr. Beall noted that she had fairly good relief of overall pain. In July 2002, after plaintiff's left shoulder surgery, Dr. Frevert noted that overall plaintiff's pain was pretty good, she was not having a whole lot of pain with her arm except when she was stretching and moving it in therapy.

From April 22, 2003, until January 15, 2004 -- nine months -- plaintiff had no treatment at all for her impairments. Plaintiff saw Dr. Hall during that time, but he specifically stated that he did not do anything medically for her on that day and simply told her he would not treat her if she would not comply with his directives. From April 5, 2004, until December 23, 2004 -- almost nine months -- plaintiff had no treatment for her impairments. On August 30, 2004, she completed questionnaires to determine her rate of impairment; however, she was not treated on that day. Plaintiff's lengthy periods with no medical care for her impairments suggests that the intensity of her symptoms is not as severe as alleged.

**4. *PRECIPITATING AND AGGRAVATING FACTORS***

The only precipitating or aggravating factor seems to be lifting or reaching above face level. The ALJ considered this

aggravating factor in arriving at an RFC which precludes working above mouth level.

**5.** ***DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

Plaintiff was prescribed Vioxx, a non-steroidal anti-inflammatory, in August 2002, prior to her alleged onset date and a few months after her first shoulder surgery. In January 2004, plaintiff saw Dr. Stitt and at the time was taking only Advil for her pain. In August 2004, plaintiff completed an Oswestry Function Test and noted that pain killers give her moderate relief from pain. In December 2004, plaintiff was taking only a non-steroidal anti-inflammatory and medication to help her sleep. In March 2005, plaintiff was taking only a muscle relaxer and sleeping medication.

Plaintiff has never been given strong pain medicine, suggesting that her pain is adequately controlled with the anti-inflammatories and muscle relaxers which have been prescribed over the years.

**6.** ***FUNCTIONAL RESTRICTIONS***

In July 2002, just after plaintiff's first surgery, she was restricted to no overhead activity and no lifting over five pounds. By the next month, she was released to work light duty. In August 2002, plaintiff was told to do regular aerobic exercise. In September 2002, plaintiff was able to complete

31

repetitive unweighted overhead reaching. In October 2002, plaintiff was returned to work full time with overhead reaching and forward reaching not to exceed 1/3 of her total work shift, and with maximum lifting of ten to 20 pounds. Later that month, Dr. Frevert noted that working light duty was good for plaintiff's shoulder. In November 2002, plaintiff was told to lift no more than ten to 15 pounds, and repetitive movement should be limited to ten times per hour.

In April 2003, about two weeks before plaintiff's alleged onset date, plaintiff was limited to no lifting over ten pounds and no overhead or repetitive lifting until she could see an orthopedic specialist.

Finally, during the hearing, the medical expert found that plaintiff could sit, stand, walk, climb stairs, or grip without limitation; could lift up to 20 pounds from waist to chest and ten pounds from chest to shoulder; could seldom bend at the waist to pick things up off the floor; and should avoid overhead activities, climbing ladders, and balancing.

Plaintiff's limitations have never been inconsistent with the limitations found by the ALJ in his residual functional capacity assessment.

***B. CREDIBILITY CONCLUSION***

In addition to the Polaski factors outlined above, I note that Dr. Hall was displeased with plaintiff's failure to follow his instructions and refused to treat her further until she did. She claimed doctors and therapists told her therapy would not help, then admitted that she did not want to pay a co-pay to have physical therapy. This also suggests that plaintiff's pain is not as severe as alleged.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of disability are not entirely credible.

Plaintiff also argued that she was unable to support her own testimony with corroborating testimony of her husband because the ALJ denied his testimony as cumulative. This argument is without merit. Here I quote that portion of the administrative hearing:

ALJ:  What would her husband add?  I don't like cumulative testimony.

Atty: I'm not going to call him, judge.

ALJ:  I mean, I would allow it, but if -- I think this lady has expressed it very well.  So I'd be more interested in what the VE, and certainly the ME have to say.

Atty: No, he would testify as to what he has to do to assist his wife --

ALJ:  Observes during the day.  Sure.

Atty: -- and her daily activity.

33

ALJ:  Which she's already said.

Atty: Yes, sir, I agree.

(Tr. at 412).

The transcript clearly shows that the attorney stated at the
very beginning that he did not intend to call the husband, and
that he agreed that the husband had nothing to offer other than
repeating plaintiff's daily activities with which she needed help
(which, incidentally, included only helping plaintiff with vests,
bras, and zipper clothing).

**VII. CONSIDERATION OF FULL RECORD**

Plaintiff argues that the ALJ's decision is not supported by
the record because plaintiff's full record was not considered in
the final decision.  Plaintiff claims that on February 23, 2006,
she supplemented her record to the Appeals Counsel with the
following additional evidence:

1.  A medical report by Ronald Stitt, M.D., on March 26,
    2004, wherein plaintiff was diagnosed as having an
    impingement syndrome of the right and left shoulders.

2.  A medical report by Sherry Michael, Ph.D., on March
    4, 2004, indicating that plaintiff was having stress
    depression and acute shoulder pain.

3.  Records dated March 7, 2005, from Harold West, M.D.,
    wherein he stated that plaintiff was having a re-tear
    of the rotator cuff on her left shoulder; records
    from March 3, 2006, wherein he diagnosed plaintiff as
    needing surgery on her right shoulder due to a re-
    tear; and records dated May 18, 2006, wherein he
    diagnosed plaintiff as needing surgery on her left
    shoulder due to a re-tear.

34

4. An evaluation done by Theodore L. Sandow, Jr., M.D., wherein he diagnosed plaintiff as needing surgery on her right shoulder and the probability of needing surgery on her left shoulder.

5. Records from plaintiff's primary physician, Washington Muro, M.D., diagnosing plaintiff as totally disabled and unable to perform any type of work.

6. A medical evaluation by Daniel Zimmerman, M.D., sent to the Appeals Counsel on February 23, 2006, wherein Dr. Zimmerman stated that the "severity of the pain and discomfort affecting the right and left shoulders and the severity of the pain medicated weakness of the upper extremities . . . would preclude her from being able to do any repetitive rapid hand and finger functions. . . . Such limitations would preclude her from being able to perform a full range of sedentary work in any setting."

None of this evidence appears in the administrative transcript. When requesting review of the ALJ's decision, plaintiff indicated that she was going to submit additional evidence (Tr. at 10-11). On February 1, 2006, the Appeals Council informed plaintiff that she could submit additional evidence relating to her condition as of the May 16, 2005, decision by the ALJ (Tr. at 7). Although plaintiff indicates that such evidence was submitted, there is no indication that it was received by the Appeals Council. It is not included in the administrative transcript. In addition, the April 26, 2006, Appeals Council decision denying plaintiff's request for review does not reference any additional evidence that was submitted (Tr. at 4-6). Therefore, it appears that this additional

35

evidence was not received by the Appeals Council -- at least not prior to its April 26, 2006, determination. Because this evidence is not part of th administrative record, it cannot serve as a basis for reversing the decision of the Commissioner. Review by the courts under 42 U.S.C. § 405(g) is confined to the evidence which was before the Commissioner at the time of his decision.

Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VIII. *PROPERLY PHRASED HYPOTHETICAL QUESTIONS*

Plaintiff next argues that the vocational expert's testimony was not based on properly phrased hypothetical questions as the questions did not include all of plaintiff's impairments, i.e., plaintiff's lack of focus, concentration, or attention span due to pain, and "no great pain" bilaterally in plaintiff's shoulders and arms.

A hypothetical question need only include those impairments which the ALJ finds credible. Randolph v. Barnhart, 386 F.3d 835, 841 n. 9 (8th Cir. 2004). In this case, there was no credible evidence that plaintiff's pain caused her to lose focus, concentration, or attention span. As discussed above, plaintiff went long periods of time with no medical care, she was never prescribed anything stronger than an anti-inflammatory or a

36

muscle relaxer, post-surgically she never described her pain to be anything higher than a 5 out of 10, and she did not complain of decreased focus or concentration to any doctor.  Plaintiff is able to attend church services and attend the theater, calling into doubt her claim of decreased attention span.

Because the hypothetical relied on by the ALJ included all of plaintiff's credible impairments, her motion for summary judgment on this basis will be denied.

## IX.  WEIGHT GIVEN TO TREATING PHYSICIANS' OPINIONS

Plaintiff argues that the ALJ's opinion is not supported by substantial evidence because he failed to indicate the weight given to plaintiff's treating physicians' opinions, i.e., the doctors whose reports were allegedly sent to the Appeals Council but with no evidence that they were ever received.

Clearly the ALJ would not be able to assess weight to opinions he has never seen.  The ALJ did, however, review the medical records submitted at the administrative hearing which included records from Dr. Hall, Dr. Stitt, Dr. West, Dr. Muro, Dr. Beall, and Dr. Frevert.  Plaintiff makes no specific argument other than that the ALJ did not assess weight to the medical records which were not before him and are currently not a part of the administrative record.  This argument is without merit.

## X.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled as she can return to her past relevant work as a receptionist.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 26, 2007

38